The Complainants applied to John Howard to befriend them, by advancing the money due on the executions; and proposed to him, that if the money which he should advance were not paid to him by 25 December, 1806, he should have the negro woman Sylvia to work for the use of the money until it should be paid. To this proposition Howard did not assent; but professed himself willing to be their friend, and advised them to let the negroes be sold, saying that he would become the purchaser and restore the property to the Complainants upon the terms of their first proposition; assigning as a reason for this course of proceeding, that the negroes could not thereafter be taken to satisfy other demands against George Williams. Complainants agreed that this course should be taken, and thereupon it was further agreed, that after the sale, the Complainants should have the possession of the negroes until 25 December next following; and if the money which Howard should advance on the executions, were not paid to him by that time, he should take the negro woman Sylvia into his possession, and have the benefit of her labor for the interest of the money, until the money should be paid. *Page 61 
On the day of sale, notice was given by Howard to the Sheriff, that he was to purchase the negroes as the friend of Complainants; and they were purchased accordingly at a price little exceeding one-half of their real value. The negroes remained in the possession of the complainants until 19 November. On the 18th of that month, Garrison Williams, one of the Complainants, went to Howard's house for the purpose of paying to him the money. Howard was not at home. (76) Williams made known his business to Howard's wife, and requested her to receive the money. He remained in the neighborhood, intending to go to Howard's house again on the next day and pay to him the money. Howard finding that Williams had raised the money, went early in the morning of the next day to Williams' house and took away the negroes. On 21 November, Williams tendered the money to Howard, and demanded the negroes. Howard refused to receive the money or deliver up the negroes, and then claimed them as his absolute property.
The bill then prayed that an account might be taken of the hire of the negroes since they came to the possession of Howard, and also an account of the money advanced by Howard for the complainants at the time of the sale: That Howard might be decreed to surrender up to the Complainants the said negroes, upon his receiving such sum of money as might be found to be due to him upon taking of the accounts, c.
Howard filed his answer, and denied the agreement charged in the bill, and denied that any agreement had been entered into between Complainants and him for the purchase and redemption of the negroes.
The bill was filed early in 1807; and at April term, 1818, the case came on to be heard; when the following issue was submitted to a jury, viz.: "Was it agreed between the complainants, or either of them, and the Defendant, that the Defendant should bid off the negroes Sylvia and Hannah, named in the bill, at the sale about to be made of them by the Sheriff of Rowan county, and that Complainants, or either of them, should have a reasonable time thereafter to repay the money to Defendant: and the Defendant upon receiving the money, relinquish his title to the negroes to the Complainants, or either of them?" — The jury found this issue in favor of the Complainants, and the counsel for Complainants moved for a decree according to the prayer of the bill. This motion was opposed upon two grounds. (77)
1. That it appeared by the bill, that Henry Williams *Page 62 
was the absolute owner of the negroes and that he ought to be a party to the bill before any decree could be pronounced.
2. That the bill sought to enforce the specific execution of an agreement relative to a personal chattel. That Equity would not enforce such agreements, except in a few peculiar cases, none of which were like the present, but would leave parties to their redress at law.
The case was sent to this Court, where it was argued by
The material allegations of the bill are, that two executions were issued against the Complainant, George Williams, which were levied upon two negro slaves, Sylvia and her child, then in his possession, and that of his son Garrison, the other Complainant. These slaves had been conveyed by George Williams to his son Henry, who, at the time of levy, was a soldier and absent with the army. Henry had conveyed the slaves to Garrison for five years, for the use and benefit of their father George. With a view of paying off the executions, the Complainants applied to the Defendant for a loan of money, and proposed as the consideration of his advancing it, that if it were not repaid by 25 December next following he might have the use of Sylvia until the money could be paid. The Defendant did not assent to this proposition; but professing to be friendly to the Complainants, advised them to submit to a sale, and agreed to become the purchaser and restore the property, upon the terms of the first proposition; alleging, as a reason for this course, that the property would thereby be put out of the reach of any subsequent demand against George Williams.
The Complainants agreed that the sale should take place, and the Defendant agreed to become the purchaser and (78) restore the slaves to the Complainant's possession, where they were to remain until 25 December; at which time if the money were not paid to the Defendant, Sylvia, was to pass into his possession, and continue there until it should be paid.
The Defendant became the purchaser, at a price something more than half of the value of the slaves, occasioned by its being generally known that he purchased for the Complainants. The negroes remained in the Complainants' possession until 19 November, when the Defendant took them away. A tender of the money was made on 21 November to the Defendant, which he refused to accept, claiming an absolute title in the negroes. *Page 63 
The jury have established the agreement stated in the bill, and the only question is, Whether the Court can decree a re-conveyance under the circumstances of this case?
The Equity of the Complainants arises out of the contract of the Defendant, who, by promising to befriend them and pointing out the way in which he could do it most effectually, occasioned a suspension of their endeavors to resort to other means of raising the money; and who, by informing the Sheriff that he was to purchase for them, and allowing the same thing to be understood generally by the persons attending the sale, prevented them from bidding, and thus acquired the property to himself at an under value. The Defendant, by his own agreement, became a trustee for the Complainants: shall he, in violation of every principle of rectitude and good faith, be permitted to set up a title in himself, bottomed upon a palpable breach of that trust? Shall he be allowed to gain a considerable benefit, at the expense of those whom he probably prevented from procuring the money by others means, and whom he certainly inspired with confidence in his proffered friendship? There is no maxim of justice recognized in this Court, which will lend its sanction to such a defence. 3 Ves., 170.
The jurisdiction of the Court, under circumstances similar to the present, is affirmed, by many cases in the (79) books; and notwithstanding the limited view of contracts respecting lands, which the statute of frauds and perjuries compels the English Judges to take, yet, in case of it has been held that no writing is necessary. The case of Thynn v. Thynn, 1 Ver., 296, involves both fraud and trust, and shews that the former makes an exception to the statute. In Lamas v. Baily, 2 Ver., 627, relief seems to have been intercepted solely by the statute; and it is therefore an authority for the complainants.
The sale under the executions was made on the suggestions and advice of the defendant, avowedly to protect the property from subsequent demands; he has no right, therefore, to pervert the sale to any other purposes, more especially to that of becoming the equitable owner of the property. Such a transaction will not bear the scrutiny of this Court. Wilkinson v.Brayfield, 2 Ver., 307.
The rule is extensively applicable, that he who bargains with another, placing confidence in him, is bound to shew that a reasonable use has been made of that confidence. Young v. Peachy, 2 Atk., 254. And it is an inference deducible from the same maxim of justice, that he who acquires a legal title by breach of trust, and by taking advantage of another's necessities, *Page 64 
which he was instrumental in producing, shall not, in this Court, set up the title against him from whom he obtained it. It is a fair presumption, that the complainants could have exerted themselves with the same success to get the money upon the levy of the execution, that they did in November when the tender was made, if they had not been lulled into a fancied security by the assurances of the Defendant.
Though the Complainants were not the absolute owners of these Slaves, and so it appears from the bill, yet they had a fiduciary possession, which they were bound to protect for the benefit of their absent relation. He, upon his return from (80) the army, would have a right to call upon them, at least upon Garrison, for a restoration of the property: and it is fit that the Defendant should be compelled to replace things in the state and condition from which his fraudulent conduct removed them. In relation to the Defendant, the Complainants are the owners of the slaves; for his conduct has concluded him from contesting their title.
It is not certain that the question arises in this case, as to the power of the Court to decree the specific execution of a contract relating to chattels: but if it be presented, I have no hesitation in giving it as my decided opinion, that the reason of the rule does not apply to slaves. That they form an exception, for reasons equally cogent, or more so, than those applicable to land. With respect to other chattel property, justice may be done at law by damages for non-performance, and therefore equity will not interpose: But for a faithful or family slave, endeared by a long course of service or early association, no damages can compensate; for there is no standard by which the price of affection can be adjusted, and no scale to graduate the feelings of the heart.